Good morning, Your Honors. My name is Robert Lano. I represent the plaintiff appellants. In this case is the easy pass for the ski industry case. There are eight defendants grouped into four groups. Each group has got a parent and subsidiary. And of those four groups, two of the defendant groups are management software, and the other two are gate access technology. This complaint was 400 paragraphs. It had numerous examples. Many incidents and plenty of exhibits. It was drafted with a conscious appreciation of Twombly, and there were many facts given. It was fact heavy. So that is the overall background for the case that went up on a motion to dismiss. Lower court did not use the appropriate standard. It should have deferred to plaintiff. It should have looked at the inferences in favor of plaintiff. It should have construed things in favor of plaintiff. It should have read the allegations as true. And it didn't. What the lower court did was the exact opposite. It accepted as true the moving parties theory. And that was wrong. So not only was plaintiff not given deference, plaintiff had an uphill battle. So it was some kind of exponential. Is it correct that the plaintiff's products were not compatible with the defendant's software? The compatibility issue was a central theme adopted by the lower court.  That is not correct. Everything has a threshold in compatibility, but that is the task of integrating. So at the threshold, were the plaintiff's products compatible with the defendant's software? And what was alleged? Didn't the complaint allege incompatibility? To the extent that every application software has to be integrated and configured with the management software, yes. It was not compatible. So the software would have had to been modified to work with the plaintiff's software? No. It would have just had to have been configured to adopt the module. All right. Who's going to pay for that? Yeah. Ultimately, initially, the defendant offered, or pardon me, the plaintiff offered to do it for free or at his cost. For example, with the NordicTrack demonstration at Gore Mountain. Counsel, in your complaint, you attached an email where it was stated when there was a discussion back and forth about this interface that it would cost hundreds of thousands of dollars for the interface to be done. So that's not something the district court took from outside the record. This is an email that you attached to your complaint. That is exactly what the lower court did wrong. Why is that wrong? That was plaintiff quoting a third party. That was plaintiff quoting Boyne Mountain. That's not what plaintiff said it would cost. That's what Boyne Mountain said it would, or Boyne Court. I know, but what do you have in your complaint to suggest that it would have cost nothing? It would have been minimal. There would have been a cost, but the thing is it would have been a reasonable cost. And that's the whole focus. Well, it was wrong for the lower court to accept that inference, which was from a third party, which was proffered by a defendant. What requires a company to spend even reasonable money to accommodate another company's product? When it's unreasonable. When the new entrant to the market has a better product with better features, and which is less costly. And plaintiff had all of that. It had money, I don't want to pay it. I don't think the complaint got to that detail. And in fact, in the implementation of it, plaintiff never got past the marketing of it to actually get into the back and forth of cost. Refresh my recollection. Did any of the 400 paragraphs in the complaint explain why they were responsible for paying for the compatibility makeover? There were paragraphs in the complaint where, for example, one management software company said it would cost $300,000. Or another resort said it wouldn't be cheap. But in terms of the actual number of what it would cost, it never got to the point where they could give a quote. The refusal to pay these amounts of money, in your view, violated what federal law? Which act? Well, let me just say that the refusal was some kind of pretext. So as to what you're saying, I don't know and don't agree that it was a lot of money. But in terms of the federal law, it would have been a Sherman Act violation. How did that violate the Sherman? Because it was a restraint of trade. These were the kind of barriers put up. I'm sorry, it was what? A restraint of trade. I don't want to pay $300,000 for your product. And I say, no, thank you. That's a restraint of trade. The Sherman Act is directed to it. You saying it would be $300,000 would be it is unreasonable when you have plaintiffs with a better product who can't get into the market. Let me ask you about a separate issue I think you have. We have said that exclusive dealings, exclusive dealer agreements, are presumptively legal unless it affects the competition in the market as a whole. Aren't you really arguing here simply that your client is affected by this? What allegation is there that the market as a whole, you have two companies with 40% of the market, 20% of the market that's still done manually? How is this affecting not just your client, but the market as a whole? How it affects the market is anybody with a better gate product would be shut out on the same rationale. And as to the 20%, those would be smaller resorts that don't have the budget for the expensive gate access technology. No, but they're not being affected at all by this, right? You have 20% of the market that's completely unaffected by this, right? This issue that you're presenting to the court, there's 20% of the market that is. You've got 20% of the resorts which are not structure of the management software coupled with the gate access company. So the E-ZPass is not applicable to that resort. The fact is, this interface issue or integration issue or compatibility issue is overblown, blown out of proportion. It's paragraph 69 in the complaint. The plaintiff, who is an engineer, so he's basically writing as an expert engineer, is saying that it would be a simple process. It involves about three steps. Configuring the ScanMan module, which is the reader. Easy or hard, I don't want your product. Why do I have to buy it? If that were the end of the story, OK. But the other half of the story is the intimidation by these management software companies to the resorts. And the intimidation, the coercion, and the influencing them. And those kind of strong arm tactics. Telling them it would cost $300,000. Having somebody at Gore Mountain say, do you get along with Seriousware? Somebody else saying, I don't want to ruffle the feathers of Seriousware. So the whole point is the intimidation part of it. Thank you. We'll hear from the other side. Good morning, Your Honors. My name is Gaspari Bono. I'm representing the Appalachee Seriousware and Asesso Technology. This court should affirm the dismissal with prejudice of plaintiff's fourth amended complaint. The district court gave plaintiff five opportunities to state a cognizable Sherman Act claim under either sections one or two. Two federal jurists below, Magistrate Judge Brown and District Judge Sabert, both decided plaintiffs failed to state a cognizable claim and could not allege a factual basis to sustain an antitrust claim. On appeal, plaintiffs have provided no basis to overturn this sound decision. As the lower court correctly found, the Seriousware defendants have no obligation under the antitrust laws to spend their own time, money, and resources developing an interface for plaintiff's product or put their own reputation on the line by supporting plaintiff's by his own admission prototype and pre-production product that has never performed in actual operation during a ski season and that the Seriousware customers have never indicated that they want. Not a single ski operator has decided to buy plaintiff's products, let alone even pursued a practice run with it. The argument is that they're being intimidated into not buying or participating with the plaintiff. This notion of intimidation is absolutely conclusory, rank speculation, innuendo. Plaintiffs, in their 400 pages of complaint or however many pages, nowhere in this entire record is there any factual basis whatsoever to support any notion of intimidation or innuendo. In fact, just the opposite. Your Honor, the only direct communication with my client, Seriousware, is found at appendix A-108, which is an email from Seriousware to Mr. Charest, the plaintiff, which says to him, we'll work with you. Here's the procedure. And they lay out, this is what you have to do. The client, the client are the ski resorts. They have to make the request. A work order then is generated. Scope of work is defined. A budget is assessed. And then, as is indicated, somebody has to agree to pay for this work, for the interface. Either the resort or the vendor, in this case, the plaintiffs. Plaintiffs never, never made this request to Seriousware. Nowhere in this record is there an allegation that the plaintiffs made a request to Seriousware that they convinced any ski resort to make this request to Seriousware to start this process. There was no refusal to deal, period, by Seriousware in this record. And I want to emphasize, Your Honor, that Plaintiff's original complaint was filed in January of 2017. And almost a year later, his fourth amended complaint was filed at the end of October of that year. Nowhere during that almost one year period of time is there any allegation that Plaintiff convinced or even approached any ski resort operators to try to convince them to make the request to Seriousware to get any indication of interest from them as to Plaintiff's products, or any allegation whatsoever of any refusal by anybody to not cooperate with him or to support his product. I think this is quite telling. Now, as Your Honors know, in a Section 1 violation, you have to have an agreement, because unilateral conduct cannot form the basis of a Section 1 violation. And when you examine Plaintiff's brief to this Court, he tries to overcome the deficiency that there's no agreement among the defendants by making four references. One, he says, oh, my complaint contains general averments of agreements. And there are agreements between the defendants concerning advertising and marketing. And there must be technology agreements between Seriousware and the access defendants. Well, of course, general averments of agreements are plainly insufficient. And advertising, marketing, and technology agreements are not unlawful restraints of trade. Plaintiff has, in grasping for the allegations of agreement to restrain trade, has demonstrated he has no evidence, no facts, to support any alleged agreement for concerted refusals to deal for Section 1 violations. Thank you very much. Thank you. Not yet. Thank you. Morning. Matt Solem, Kirkland & Ellis on behalf of ACTIV and VISTA. There are a number of fundamental problems with this complaint. Decision should be affirmed. ACTIV is alleged in 2009 to have refused to do business with Plaintiff. At the time, as candidly as admitted in the reply brief here on appeal, and this is at page 16, there wasn't even a product at the time. And this is in response to our argument that the statute of limitations four years bars the claims against ACTIV because nothing further is alleged as to ACTIV, which at the time was called Resort Technology Partners, or RTP, after 2009. In Plaintiff's brief, Plaintiff then says, this is the reply brief on appeal, a claim brought in 2009 to 13 was not viable because plaintiffs did not even have a completed product to sell. A claim brought them would have been speculative. Accordingly, the 2009 facts are merely historical background, not operative facts. And those are the only facts alleged as against ACTIV. As to VISTA, the one other client that I represent, the only allegations as against VISTA are that it bought ACTIV in 2013. How those two collective facts could then ever state any sort of antitrust claim against either entity, the claims necessarily fail. Fail for statute of limitations under four years, they fail for the antitrust insufficiencies. That is to say, there's no indication of any sort of refusal to do business, even because there wasn't even a product in place, at least for ACTIV, unless there are further questions. Thank you. Thank you. Good morning, Your Honors. Daniel Brown representing Access North America and Access AG. Just want to start with Access AG. There's no dispute in the record that Access AG, an Austrian company, was not served with process. There's no dispute that they weren't served. So dismissal is appropriate under Rule 12b-5. There's also no personal jurisdiction. There's no legitimate argument against personal jurisdiction. The record contains affidavits affirming the lack of minimum context. In response, all that appellant can say is that he thinks there likely might be personal jurisdiction. That, of course, is not enough. As to the allegations against Access AG, I invite the court to please look at page 17 of the Access joint brief, which lays out verbatim the allegations against Access AG. There's just absolutely nothing there other than an allegation of apparent subsidiary relationship. That, of course, does not state a claim. And then as to the antitrust claims themselves, I invite the court to try to find an allegation in the complaint that says anything at all. The only allegations against the access defendants are conclusory allegations that the access defendants collude with others, that our products are widely used, and that we have a vertical agreement with the resort manufacturers who use our software. The allegations that purchasers of our products refuse to replace our products says nothing about the access defendants doing anything at all. They certainly do not state an antitrust claim. Thank you. Thank you. Good morning, Your Honors. Douglas Broder for the defendants, Skidata Inc. and Skidata AG. In our briefs and in the arguments presented by the other appellees this morning, it's been shown that the complaint was properly dismissed for failure to plausibly plead any anti-competitive conduct, among several other independently sufficient reasons for infirmance. I just wanted to make one point that relates specifically to the Skidata appellees and that responds to the plaintiff's reply brief. In our brief, we showed that the complaint lacks the necessary specificity as to our clients who are gate makers here. We showed that the only facts, as opposed to conclusions and speculations regarding alleged anti-competitive activity by our clients related to 2009, a time well outside the statutory limitations period. In reply, the plaintiffs state that even those facts were just background and thus evidently not meant to form the basis for any claim. So that leaves nothing in the way of specific facts relating to anti-competitive conduct by our clients, other than that they participate in a market that the plaintiffs haven't been able to break into and that they have per se legal vertical relationship with other participants in the market. These allegations are plainly insufficient under Twombly and Iqbal. Thank you, your honors. Thank you. We'll hear the rebuttal. Thank you again, your honor. Back to the first point of serious where about how serious where was never. In front of the microphone. I'm sorry about that, about how serious where was never contacted by plaintiffs. Once again, the proper procedure for this by serious where's own protocols was plaintiff has to contact the resort first. Plaintiff did that. He called them, he emailed them, he met face to face. Things were moving along with a lot of these ski resorts and that's when things suddenly stopped and he ran into a brick wall. That's the point of it. He did contact the resorts and that defense that nothing ever was communicated to serious where is wrong. He couldn't get past that hurdle due to the intimidation. Why do you think your service of process on AG was proper? I wasn't here for that but I believe my client served. I'm sorry, you what? I wasn't here for that but I believe my client. You're here for it now because it's in the file. Right, but he sent a FedEx to the Austrian defendant and that has been briefed by their attorney that it's defective. Do you believe that, what's your position on that? My position is that if things were dwelled upon hyper-technically, there's merit to that argument but if that subject were focused upon hyper-technically, it would be defective. As a matter of substantively, whether that defendant was put on notice which is the undercurrent of all the service rules, they were put on notice. So in a overview, they were on notice. In a hyper-technical rule-oriented perspective, it's defective. According to your approach, you could have called them up on the telephone and summarized your 400 paragraph complaint and that would have been satisfactory if we were dealing in something other than a hyper-technical universe. I do disagree with that. Finally, or secondly, as to the agreements, there were agreements. The point of the antitrust law is to forbid combinations and concerted action and arrangements. That's been the mainstream of the law. In Twombly, they do say, you've got to get an agreement in there and we did say there were agreements. Definitely, the two entities would agree and in technology, they had to agree to implement the software and in marketing, they promote each other. Given all of that, their agreements now add in all the other plus factors and intimidation and that states the claim. Thank you, Your Honor. Thank you. We'll reserve decision.